# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| MARY P. BLACK, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:13-CV-79-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
|     Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Mary P. Black on October 22, 2013, and a Plaintiff's Brief in Support of Her Motion to Reverse the Decision of the Commissioner of Social Security [DE 17], filed by Plaintiff on June 4, 2014. Plaintiff requests that the July 3, 2012 decision of the Administrative Law Judge denying her claim for disability insurance benefits be reversed and remanded for further proceedings. On August 13, 2014, the Commissioner filed a response, and Plaintiff filed a reply on August 21, 2014. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff suffers from chronic neck and back pain, coronary artery disease, degenerative disc disease, ulcerative colitis, unstable angina, bowel problems, headaches, depression, and anxiety. On January 14, 2011, Plaintiff filed an application for disability insurance benefits, alleging an onset date of December 12, 2008. The application was denied initially on March 17, 2011, and upon reconsideration on May 4, 2011. Plaintiff timely requested a hearing, which was held on June 26, 2012, before Administrative Law Judge ("ALJ") Henry Kramzyk. In appearance were Plaintiff, her attorney, and a vocational expert.

The ALJ issued a written decision denying benefits on July 3, 2012, making the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2012.

2. The claimant has not engaged in substantial gainful activity during the period from her amended alleged onset date of May 10, 2011 through her date last insured of June 30, 2012.

3. Through the date last insured, the claimant had the following severe impairments: coronary artery disease, degenerative disc disease of the thoracic spine; degenerative disc disease of the cervical spine-status post rhizotomy; and, degenerative joint disease of the right shoulder-status post surgery.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: the claimant could never climb ladders, ropes, or scaffolds, or kneel, or crawl; the claimant could occasionally reach overhead and perform fine and gross manipulations with her right dominant upper extremity.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born [in 1962] and was 50 years old, which is defined as an individual closely approaching advanced age, on the date last insured.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that

existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 10, 2011, the amended alleged onset date, through June 30, 2012, the date last insured.

(AR 11-22).

On August 22, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. On October 22, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski*

*v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's

residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff argues that remand for further proceedings is required because the ALJ (1) failed to include restrictions related to mild limitations in concentration, persistence, or pace in the mental RFC and failed to identify an evidentiary basis for the physical RFC; (2) improperly evaluated Plaintiff's credibility; and (3) ignored evidence concerning Plaintiff's occipital neuralgia. The Court considers each argument in turn.

### A. Residual Functional Capacity

Remand is required for a proper mental and physical RFC determination. The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *Young*, 362 F.3d at 1000; 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC

is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. In addition, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id*.

1. *Mental RFC–Concentration, Persistence, or Pace*

The ALJ erred by failing to consider the effects of Plaintiff's mild restrictions in social functioning and in concentration, persistence, or pace on her mental RFC. *See Winfield v. Colvin*, No. 2:11-CV-432, 2013 WL 692408, at *4 (N.D. Ind. Feb. 25, 2013); *Underwood v. Colvin*, No. 2:11-CV-354, 2013 WL 2420874, at *3-4 (N.D. Ind. May 30, 2013). An ALJ must consider all limitations that result from medically determinable impairments, even those that are not severe. *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In this case, the ALJ did not discuss whether and, if so, how he determined that Plaintiff's non-severe mental impairments of anxiety and depression produced no functional limitations.

7

At step two of the sequential analysis, the ALJ performed the special technique, finding that Plaintiff had mild limitations in social functioning and in concentration, persistence, or pace and finding that Plaintiff's anxiety and depression were not severe. Recognizing that the analysis at step two is different from that required to determine the mental RFC, the ALJ concluded step two with this transition: "The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)." (AR 15). Yet, the ALJ does not conduct any such detailed assessment.

Rather, the ALJ made two statements regarding her mental impairments in the RFC. First, the ALJ noted, without discussion, that the psychological consultants, Dr. Neville and Dr. Larsen, "opined that the claimant had no severe mental impairments." (AR 20). This is nothing more than a recitation of evidence that supports that ALJ's step two determination. Second, the ALJ commented that "[t]here is no subsequent evidence of worsening of her mental impairment symptoms." *Id*. The fact that the symptoms of Plaintiff's mental impairments had not *worsened* does not inform the question of whether she suffers any limitations as a result of those impairments. The ALJ provided no further discussion of Plaintiff's mental impairments in the context of the RFC.

During her consultative psychological examination in February 2011, Plaintiff informed V. Rini, Psy.D. that she experiences periods when she loses the motivation to keep herself groomed and had experienced suicidal ideation. She reported experiencing weekly crying spells, changes in appetite, and frequent napping during the day. Dr. Rini observed that Plaintiff's affect was depressed and that she wept during the interview. Plaintiff remembered two out of five items after three

minutes and made five errors in performing serial sevens. Plaintiff did not know the direction in which the sun rises. Dr. Rini diagnosed major depressive disorder, moderate and recurrent, and generalized anxiety disorder. In her Adult Function Report, Plaintiff averred that she must continually check to ensure that she is properly following written instructions and that she needs to write down spoken directions. Her husband also indicated that Plaintiff reads written instructions "over and over" and that she almost always writes down verbal instructions. On the Psychiatric Review Technique Form, state agency psychologist Dr. Kenneth Neville reviewed Plaintiff's medical history and determined that she had mild restrictions in maintaining social functioning and in concentration, persistence, or pace.

At the hearing, Plaintiff testified that she had minimal interaction with others. She testified that she left the workforce in 2008 because she was unable to remember recipes and the procedure for making coffee that was required for that job. She testified that she suffers panic attacks and rarely desires to socialize, describing herself as a "basket case." She testified that she suffers anxiety and chest pains when in a group setting.

The Commissioner cites case law for the proposition that the ALJ need only minimally articulate his reasoning. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). But in this case, the ALJ gave *no* reasoning and, in fact, drew no conclusion about mental limitations in the RFC. Although the ALJ discussed Plaintiff's mental health records at step two, the ALJ did not do so in the context of determining whether Plaintiff suffers from any functional limitations as a result.

The Commissioner is correct that mild or even moderate limitations do not necessarily prevent an individual from functioning satisfactorily, citing *Sawyer v. Colvin*, 512 F. App'x, 603,

611 (7th Cir. 2013). However, in *Sawyer*, the court made that comment at step five in the context of analyzing the vocational expert's testimony; earlier in that decision, the ALJ conducted a mental RFC determination. In this case, the possibility that Plaintiff ultimately may not have any functional limitations does not excuse the ALJ from conducting the proper analysis. The Court remands for a proper mental RFC determination.

2.     *Physical RFC*

On March 1, 2011, Dean A. Choucair, D.O., M.P.H. conducted a consultative examination. Dr. Choucair found that Plaintiff had full range of motion in her upper extremities and that her musculoskeletal examination was unremarkable. On neurological examination, Plaintiff had good muscle strength and tone graded 5/5 in the bilateral upper and lower extremities; her deep tendon reflexes were 2/4 in the bilateral upper and lower extremities; and she had good grip strength bilaterally and the ability to perform fine and gross movements effectively on a sustained basis.

On April 20, 2011, Plaintiff presented for evaluation for right shoulder pain from an injury two weeks earlier from yard work and hammering. At the May 24, 2011 follow up visit, Plaintiff reported increased pain in the right arm and shoulder. On examination, she had decreased range of motion of the right shoulder joint due to joint pain especially with internal and external rotation and she was tender over the anterior shoulder joint. The impression from a May 25, 2011 MRI of the right shoulder was a "minor amount of signal abnormality which is somewhat focal along the anterior edge of the supraspinous tendon involving the under surface at its attachment to the humeral head compatible with a very small tear of the under surface of the tendon. There is not evidence of neither retraction nor fatty atrophy of supraspinatus musculature." (AR 496). On examination on

June 7, 2011, Plaintiff had decreased range of motion. On June 30, 2011, Plaintiff was given a cortisone injection into the right subacromial space.

Because the conservative treatment did not provide relief, on August 27, 2011, Plaintiff underwent a subacromial decompression and hypertrophic bursectomy and an arthroscopic debridement of the glenoid labrum tear. Over the next several months, Plaintiff's pain level and weakness improved. In October 2011, her pain level was 3 out of 10 on a scale of 0 to 10, with 10 being the highest level of pain. On November 11, 2011, Plaintiff reported that her pain and weakness were improving, and her doctor released her to progressively increase normal activities as tolerated. The next treatment record is from May 18, 2012, when Plaintiff presented with recurring right shoulder pain with a pain level of 7 out of 10. On examination, Plaintiff's range of motion of the shoulder and the cervical spine was normal. Plaintiff was given a cortisone injection in the right and left subacromial spaces. Two weeks later, Plaintiff was moderately better with her pain having subsided by 80%, but she still complained of stiffness in her fingers. She had appropriate range of motion.

The ALJ found that Plaintiff retained the RFC to perform work at the light exertional level but could never climb ladders, ropes, or scaffolds, could never kneel or crawl, could occasionally climb ramps or stairs, and could occasionally reach overhead and perform gross and fine manipulations with the upper right extremity. The ALJ gave this RFC for light work after assessing Plaintiff's credibility and after reviewing the state agency medical consultants' opinions.

First, after reviewing the medical evidence, including the injury to Plaintiff's right shoulder, the ALJ found that Plaintiff "is not credible," finding that certain allegations were inconsistent with her husband's report, that her subjective allegations were "grossly disproportionate with objective

11

findings," and that examinations consistently showed no significant abnormalities. (AR 19). Notwithstanding the adverse credibility finding, the ALJ limited Plaintiff to light work because she had a history of mild to moderate coronary artery disease and mild to moderate degenerative changes in her cervical and thoracic spine.

The ALJ then found that there was no evidence of advanced muskuloskeletal changes or any indication for spinal surgery such that her standing and lifting tolerance would be any more limited. He noted that her primary exertional limitation is a degenerative spine with the addition of the right shoulder injury. He commented that there is no evidence of "more than subjective fatigue or general weakness." (AR 19). He found that "the claimant had normal strength and no shortness of breath at most, if not in all examinations of record. The evidence does not support that claimant could not occasionally lift 20 pounds. Her husband estimated that she could lift up to 15 pounds." (AR 20). As for reaching, handling, and fingering, the ALJ gave Plaintiff "the fullest benefit of the doubt" based on her right shoulder surgery that involved impingement syndrome and reduced her ability to perform fine and gross manipulations and to reach overhead with her right upper extremity to occasionally.

Second, the ALJ reviewed the opinion evidence. On March 17, 2011, consultative reviewer B. Whitley, M.D. opined that Plaintiff retained the capacity to perform work at the medium exertional level and was subject to no restrictions in pushing and pulling and to no postural, manipulative, visual, communicative, or environmental limitations. Dr. Whitley's opinion was affirmed by Fernando R. Montoya, M.D. on May 2, 2011. The ALJ gave substantial weight to these opinions. However, both opinions predate Plaintiff's shoulder injury. No other medical opinion evidence was submitted. In her response brief, the Commissioner insists that "all of the medical

opinions in the record unanimously contradict Plaintiff's allegations of her disability and support the ALJ's RFC assessment" without acknowledging that the opinions predate Plaintiff's shoulder injury. Similarly, the Commissioner details all of the medical records the ALJ considered; but neither the ALJ nor the Commissioner identify any records that show that Plaintiff *can* lift 10 pounds frequently and 20 pounds occasionally.

Despite giving substantial weight to the opinion for medium exertional work from March 2011 and despite finding Plaintiff *not* credible, the ALJ rejected the opinion for exertional work and gave "the claimant the fullest benefit of doubt based on her testimony and history, and considering that, she had a right shoulder injury after the physical assessments were made, and has reduced exertion to light [work] with other appropriate limitations . . . ." (AR 20).

Despite the ALJ assessing an RFC for light work rather than for the medium work opined by the consultative reviewers, Plaintiff nevertheless contends that the ALJ erred by not identifying objective or subjective evidence that supports the RFC finding and that the ALJ crafted the RFC assessment from his own lay understanding of the effects of her impairments. In *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011), the ALJ based her finding that the claimant could stand for 6 hours in a regular work day and lift 10 to 20 pounds on the state agency examiner's report. However, the court found that nothing in that report suggested that the claimant could do either; rather, the report stated that the claimant had successfully walked 50 feet without a cane within the office. *Id*. Nor was there evidence in the report that the examiner tested the claimant's ability to lift heavy objects. *Id*. The court found that the ALJ had not explained how she reached her conclusions about the claimant's physical capabilities. *Id.*

In this case, the ALJ appropriately found that Plaintiff could do less than the medium level work assessed by the consultative reviewers based on her shoulder injury and her history of coronary artery disease and degenerative changes to her cervical and thoracic spine. However, like in *Scott*, the ALJ did not explain how he found that Plaintiff could do light work, as opposed to less than light work, other than to broadly state that there is "no evidence of advanced musculoskeletal changes or any indication for spinal surgery such that her standing and lifting tolerance would be more limited." (AR 19). The ALJ does not explain how either of these situations would be determinative of the amount Plaintiff could lift occasionally or frequently. Thus, once the ALJ found that Plaintiff was more limited than the state agency physician had opined, the ALJ was left with an evidentiary deficit to support his finding that Plaintiff had the ability to lift 10 pounds frequently and 20 pounds occasionally.

The ALJ did not rely on Plaintiff's testimony and subjective allegations because Plaintiff testified that she could not lift a gallon of milk, which weighs approximately 8.6 pounds and that she could not stand for more than ten minutes at a time. Nor did the ALJ identify evidence suggesting that Plaintiff was capable of overhead reaching or fine or gross manipulations occasionally, as opposed to for some shorter amount of time. The ALJ did not explain how the raw medical data led him to conclude that Plaintiff could stand and walk for six as opposed to five, four, three, two, or one hours in an eight hour day. *See Goins v. Colvin*, 764 F.3d 677, 680, 682 (7th Cir. 2014) (finding that the ALJ should have gotten a medical report on a subsequent MRI rather than interpreting it himself in a case in which the ALJ uncritically accepted the conclusions of a consulting physician who had not reviewed the MRI). Although the ALJ included the November 2011 treatment note that Plaintiff was released to normal activities as tolerated in relation to her

shoulder, the ALJ did not discuss Plaintiff's return for treatment of recurring right shoulder pain in May 2012.

The ALJ did not explain how he determined that work at the light exertional level was appropriate once he had determined that Plaintiff could not lift and carry the 25 pounds that was regularly required as part of medium work. As a result, the ALJ's assessment of Plaintiff's residual functional capacity is not supported by substantial evidence. *See Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010). Notably, an individual like Plaintiff who is closely approaching advance age (ages 50-54), who possesses a high school education, who has no transferable work skills, and who is limited to sedentary work is to be found disabled. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.12. On remand, the ALJ is directed to set forth the evidentiary basis for the RFC finding and may wish to consider obtaining the opinion of a medical advisor or seeking clarification of the record if necessary. *See Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 2006) (citing *Barnett*, 381 F.3d at 669; *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995)).

## B. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)  The individual's daily activities;
(2)  Location, duration, frequency, and intensity of pain or other symptoms;
(3)  Precipitating and aggravating factors;
(4)  Type, dosage, effectiveness, and side effects of any medication;
(5)  Treatment, other than medication, for relief of pain or other symptoms;
(6)  Other measures taken to relieve pain or other symptoms;

15

(7) Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367 (citing *Terry*, 580 F.3d at 477); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

Plaintiff first argues that the ALJ's credibility determination is flawed because he found her "not credible," (AR 19), but then gave her the "fullest benefit of the doubt," (AR 21), when he concluded that she could only occasionally reach overhead with the right upper extremity and only occasionally perform fine and gross manipulations with the right upper extremity. Indeed, these statements are inconsistent. Although the Commissioner makes a persuasive argument that the ALJ found Plaintiff "not credible" generally regarding her physical impairments but that he gave her "the fullest benefit of the doubt based on her testimony *and* history," (AR 20), with regard to her right shoulder injury, the ALJ did not make that distinction. The ALJ clearly concluded: "A review of the evidence shows that the claimant is not credible." (AR 19). This is an impermissible internal inconsistency within the ALJ's decision. Remand is required for the ALJ to properly explain his credibility determination.

16

In a related vein and closely tied to the RFC analysis above, Plaintiff argues that the ALJ did not explain why he did not limit Plaintiff to less than occasional overhead reaching and occasional fine and gross manipulation with the upper right extremity if he gave her the "fullest benefit of the doubt." Plaintiff testified that her right arm strength was so severely diminished that she was unable to pour a cup of coffee with the right hand. She also testified that she suffered spasms in the right hand and right arm, that she was unable to lift and carry a gallon of milk, that she suffered tingling in the right hand as well as diminished grip strength, that she dropped drinking glasses, and that she did not have sufficient grip strength to twist a lid off of a jar. If the ALJ had truly given Plaintiff the full benefit of the doubt, he would have reduced the amount of weight Plaintiff could lift to less than a gallon of milk and precluded Plaintiff from having to grip or twist objects with the right hand. The Court remands on this issue for an explanation.

In assessing her credibility, the ALJ found certain of Plaintiff's statements to be inconsistent with those of her husband. However, the ALJ subsequently weighed Plaintiff's husband's statements and found them to be internally inconsistent and unsupported and, thus, entitled to little weight to the extent they were inconsistent with a finding that Plaintiff could perform work at the light exertional level. Plaintiff criticizes the ALJ's use of the husband's statements to find Plaintiff less than credible given that those statements were given little weight. On remand, the ALJ is directed to clarify the weight given to Plaintiff's husband's statements in relation to Plaintiff's credibility.

The ALJ also erred by not addressing the impact that the side effects of Plaintiff's prescription medications had on her ability to sustain employment. The Commissioner does not respond to this argument. Plaintiff testified that her medications caused drowsiness, forgetfulness, and diminished her ambition. The ALJ recited these side effects in his decision, but he did not assess

the credibility of her statements regarding side effects and failed to determine the impact of the side effects, if any, on her ability to work. It may be that because the ALJ initially found her "not credible," he also found her statements about medication side effects to be not credible. In light of his decision to later give her the benefit of the doubt as to some statements, the failure to discuss the medication side effects must be remedied on remand.

Finally, Plaintiff argues that the ALJ's use of the oft-discussed boilerplate language to decide Plaintiff's credibility requires remand. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). On remand, the ALJ is directed not to use the boilerplate language.

### C. Occipital Neuralgia

Plaintiff argues that the ALJ committed reversible error by ignoring evidence that concerned her severe headaches caused by occipital neuralgia. Plaintiff is incorrect. So is the Commissioner. Surprisingly, both parties state that the ALJ did not reference the diagnosis of occipital neuralgia when, in fact, the ALJ did so in the third full paragraph on page 8 of his decision. *See* (AR 18).

At the hearing, Plaintiff testified that she experienced constant headaches and that twice each week she suffered a migraine headache that lasted up to a full day. In her brief, Plaintiff cites an October 26, 2010 treatment record from Dr. Kondamuri, showing that she suffered headaches that originated in the temporal region and the top of the head. *See* (Pl. Br. 9 (citing (AR 348))). At that visit with Dr. Kondamuri and at earlier visits in August and September 2010, she reported symptoms that the headaches affect her vision with spots and lines going through the eye and feeling lightheaded when she stood. *Id.* (citing (AR 336, 337, 348)). Plaintiff then notes in her brief that she was diagnosed with occipital neuralgia at that October 26, 2010 visit. At that same visit, Plaintiff was also diagnosed with cervical facet syndrome, cervical spondylosis, cervical strain, and

18

cervicogenic shoulder and headache pain. (AR 349). What Plaintiff fails to include in her summary of the medical record is that, following that October 26, 2010 diagnosis, she underwent a series of nerve blocks and ultimately a radiofrequency rhizotomy in February 2011, treatments that resulted in 75–100% relief of her headaches with no subsequent treatment.

All of this was discussed by the ALJ. He noted Plaintiff's hearing testimony and discussed the treatment records of Dr. Kondamuri, including the October 2010 diagnosis of occipital neuralgia, the injections, and the radiofrequency rhizotomy. (AR 18). The ALJ recognized that in March 2011, at the consultative examination, Dr. Shoucair found that Plaintiff had good, full range of motion in the neck, full range of motion in the upper extremities, and a normal musculoskeletal and neurologic examination. The ALJ further noted that a week later, Plaintiff told Dr. Kondamuri that she had 75% relief of pain, was taking an occasional Vicodin tablet and Tramadol at bedtime, and did not feel she needed any further pain procedures. The ALJ noted that Dr. Kondamuri prescribed physical therapy because Plaintiff still had some pulling in her neck. Plaintiff does not discuss these records or the ALJ's consideration of them. The ALJ concluded that, "[w]hile there is evidence of periodic worsening of pain, there is no longitudinal evidence of extreme pain or constant headache, or weekly migraines, and treatment records show good response to pain treatment." (AR 19).

Notably, Plaintiff does not identify any subsequent treatment records for headaches. Thus, the ALJ's decision regarding Plaintiff's headaches, which included those headaches caused by occipital neuralgia, is supported by substantial evidence, and remand is not required on this basis.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of Her Motion to Reverse the Decision of the Commissioner of Social Security [DE 17],

**REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 3rd day of March, 2015.

s/ Paul R. Cherry  
MAGISTRATE JUDGE PAUL R. CHERRY  
UNITED STATES DISTRICT COURT

cc: All counsel of record